[No. 59702-2.   En Banc.   June 16, 1994.]

JOSEPH TINCANI, ET AL, *Respondents*, v. INLAND EMPIRE ZOOLOGICAL SOCIETY, *Petitioner*.

124

*Richter-Wimberley, P.S.,* by *Daniel E. Huntington,* for petitioner.

*D.E. McKelvey, Jr., P.S.,* and *Timothy B. Fennessy; Martin, McAllister & Murphy* and *Robert McAllister,* for respondents.

GUY, J. — Petitioner Inland Empire Zoological Society, doing business as Walk in the Wild Zoo (hereafter Zoo), seeks review of a Court of Appeals decision affirming a judgment against it in a personal injury action brought on behalf of Richard Tincani. We reverse and remand for a new trial.

## FACTS

On November 12, 1987, Richard Tincani, along with 39 eighth and ninth grade students from Frontier Junior High School in Moses Lake, departed on a field trip to several points of interest in Spokane. The students were accompanied by two teachers, the school principal, and four parents. Tincani was 14 years 11 months old at the time of the trip.

After visiting several locations in the morning, the group of students and adults traveled by bus to the Zoo in the early afternoon. The Zoo, which is located in the Spokane Valley, is a 240-acre zoological and botanical preserve. In November 1987, the general layout of the Zoo included a circular trail that proceeded through a natural setting in which animals were exhibited roaming free or in cages. At the entrance to the Zoo, adjacent to the turnstiles, was a 2-foot by 4-foot sign that included the statement: "STAY ON MAIN TRAIL". The circular main trail is a 4- to 6-foot-wide hard-packed dirt trail, marked in some areas by stones or pebbles. The stated purpose of the directions to "stay on main trail" was to protect the Zoo's natural habitat from damage by visitors. The Zoo also has a number of unmarked paths and trails result-

ing from erosion, other visitors, and animals, none of which are depicted on the map.

When the group arrived at the Zoo, Larry Koester, the students' biology teacher and organizer of the trip, went to the entrance window and announced to a Zoo employee the group had arrived. The Zoo charged each student a $1 admission fee, which Koester had collected and paid upon arrival. Other than receiving general greetings, Koester did not receive any special instructions from Zoo officials. Koester testified he had called the Zoo in advance to ask questions about bringing a large group and whether there were any special requirements. No special instructions were given. Although the Zoo had an unwritten chaperon policy which required an adult chaperon for every group of five to six children, this policy was not generally enforced.

Before entering the Zoo, Koester instructed the students to act as responsible young adults. Koester informed the students they would be on their own to explore whatever interested them within the Zoo. Koester was given a bundle of 18 to 20 maps of the Zoo, which he handed to a student to distribute among the field trip participants. The map instructed people to "PLEASE STAY ON MAIN TRAIL". The Zoo was aware visitors often followed animal paths off the main trail.

Tincani and four of his schoolmates headed down the main trail in a counterclockwise direction. None of the boys in Tincani's group received a map. The group was not accompanied by an adult chaperon. As they proceeded down the trail, they followed signs to the eagles and a sign that said "nature trail". They followed the "main" nature trail further until they approached an apparent fork in the trail. These paths or trails off the main trail were described as animal trails, no more than a foot in width, not beaten down, and covered with vegetation. The boys followed this trail until it split into another fork. One boy testified he did not realize they were off the "main" trail because the sign they had initially followed stated "nature trail". Another boy testified he knew they were off the main trail and were in fact follow-

ing an "off-to-the-side trail". There was no sign warning patrons not to take this trail, nor were there any signs warning patrons of any rock outcroppings.

At the second split in the trail, Tincani went in one direction and the other boys went in another direction. Eventually the boys lost sight of Tincani and ended up on different points of high ground. Jorge Rodriquez, one of the boys in the group, testified Tincani called out to him and asked him to wait. Rodriquez testified Tincani then tried to find a way down a rock outcropping[1] to meet up with them. Tincani's first attempt to climb down was unsuccessful. Noticing Tincani was trying to figure out a way down, Rodriquez told Tincani to go back the way he had come and he would wait for him. Rodriquez testified Tincani then told him he had found another way down. Rodriquez observed Tincani proceeding down natural steps in the rock formation from which he jumped 3 to 6 feet to a rock ledge. From that ledge, Tincani lost his footing and fell approximately 20 feet to the ground, suffering serious injuries. Tincani has no recollection of his visit to the Zoo.

## Procedural History

Tincani and his parents sued the Zoo, the Zoo's general manager, the Moses Lake School District, and the teachers who went on the trip. Tincani settled with the school district, dismissed the general manager and the teachers, and proceeded to trial against the Zoo. The Zoo moved for summary judgment, arguing it had no duty to warn Tincani of any dangers associated with the cliff, and he had assumed the risk. The trial court denied the Zoo's motion. The Zoo subsequently moved for a directed verdict. The trial court denied this motion as well.

By special verdict, the jury found Tincani had suffered damages in the amount of $1,044,199.66. The jury found Tincani, the Zoo, and the school district comparatively negligent and their respective actions were a proximate cause of

---

[1]The "rock outcropping" is alternatively described by both parties as a "cliff" and, at other times, a "rock formation".

Tincani's injuries. The jury allocated 65 percent of the fault for Tincani's injuries to Tincani, 25 percent to the Zoo, and 10 percent to the school district. Accordingly, the trial court entered judgment against the Zoo in the amount of $261,049.92. The Zoo filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The Zoo's motion was denied and it appealed. The Court of Appeals affirmed the judgment, holding the Zoo owed Tincani a duty of reasonable care "irrespective of his status on the property". *Tincani v. Inland Empire Zoological Soc'y*, 66 Wn. App. 852, 858-62, 837 P.2d 640 (1992). The Court of Appeals also held Tincani's assumption of the risk was not a complete bar to his recovery against the Zoo. *Tincani*, 66 Wn. App. at 860. We granted the Zoo's petition for review. We reverse the Court of Appeals insofar as it holds a landowner owes a duty of reasonable care to children regardless of age or status and remand this matter for a new trial.

### ISSUES

This case presents three issues for review: .

1. Did the Zoo owe 14-year-old Richard Tincani a duty of reasonable care regardless of his age or status on the premises? We hold the Zoo did not owe such a general duty and decline to depart from the common law duties owed to invitees, licensees, and trespassers.

2. Did the jury reach an inconsistent verdict? We conclude the jury's finding that Tincani was a licensee at the cliff conflicts irreconcilably with its finding that the Zoo was partially at fault for Tincani's injuries.

3. Did Tincani's conduct constitute implied primary assumption of the risk of harm which represents an absolute bar to recovery? We hold Tincani's conduct did not constitute *implied primary* assumption of the risk.

### ANALYSIS

### I

### Status Determines Duty of Care

A cause of action for negligence requires the plaintiff to establish (1) the existence of a duty owed, (2) breach of

that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury. *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984). The threshold determination of whether the defendant owes a duty to the plaintiff is a question of law. *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991) (citing *Pedroza*, 101 Wn.2d at 228). In premises liability actions, a person's status, based on the common law classifications of persons entering upon real property (invitee, licensee, or trespasser), determines the scope of the duty of care owed by the possessor (owner or occupier) of that property. *Van Dinter v. Kennewick*, 121 Wn.2d 38, 41, 846 P.2d 522 (1993); *Younce v. Ferguson*, 106 Wn.2d 658, 666-67, 724 P.2d 991 (1986). *See generally* W. Page Keeton et al., *Prosser & Keeton on Torts* §§ 58-61 (5th ed. 1984) (hereafter *Prosser & Keeton on Torts*).

The parties dispute the duty of care the Zoo owed Richard Tincani at the time his injury occurred. By special verdict, the jury found Tincani was a licensee at the time he was climbing on the cliff. The jury further found the Zoo, the Moses Lake School District, and Tincani were negligent, and such negligence, in each case, was a proximate cause of Tincani's injuries. The Zoo appealed, claiming the trial court erred in several of its instructions to the jury regarding the duty owed by a zoo operator. The Court of Appeals affirmed the judgment, holding the Zoo owed Tincani, a 14-year-old child, a duty of reasonable care *regardless of his status* on the property. *Tincani*, 66 Wn. App. at 858. In view of its holding, the Court of Appeals declined to address the Zoo's claimed errors regarding the trial court's instructions to the jury relating to Tincani's status on the property. *Tincani*, at 859.

The Zoo argues the Court of Appeals erred by failing to apply Washington's common law rules governing premises liability to Tincani. The Zoo maintains while Tincani was a business invitee upon entering the Zoo, he lost that status and became a licensee when he departed from the main trail and began to climb upon the cliff. The Zoo argues it does not owe Tincani, a licensee, any duty to warn or otherwise protect him from risks associated with natural conditions on its

property, and the jury's verdict to that effect was error and conflicting.

Tincani agrees with the Zoo that, at some time after entering the Zoo, he strayed beyond the area of his invitation and became a licensee. Tincani disagrees with the Zoo that once he became a licensee any and all prior violations of the duties owed to him as a business invitee were forgiven. Tincani maintains while he was a business invitee, the Zoo was negligent because it failed to warn him of the known dangerous condition of the cliff or to make the condition safe.[2] Tincani argues because the jury was properly instructed with regard to proximate cause, there is substantial evidence to support the jury's verdict one or more of the alleged violations of the Zoo's duty proximately caused his injuries.

## Court of Appeals Decision

We first discuss whether the Court of Appeals erred by refusing to apply Washington's common law rules governing premises liability to 14-year-old Richard Tincani. The Court of Appeals acknowledged the jury was instructed the determination of whether the Zoo owed Tincani a duty depended upon the common law classifications of entrants upon land. *Tincani*, at 857 n.1. The court concluded, however, the Zoo owed Tincani a duty of reasonable care, "irrespective of his status on the property". *Tincani*, at 858. We disagree.

The authorities cited by the Court of Appeals do not support so broad a rule. In support of its holding, the Court of Appeals cited the following language from *Ochampaugh v. Seattle*, 91 Wn.2d 514, 588 P.2d 1351 (1979):

> Where activities are carried on by the possessor of land, we have imposed a *duty of exercising reasonable care not to injure a child* of whose presence the possessor or his agents is aware, *regardless of the child's status*, even though no "attractive nuisance" is involved. . . .

---

[2]Tincani contends he was owed a duty of reasonable care while he was a business invitee and the Zoo breached that duty in several ways: (1) the Zoo knew, or should have known, of the rock outcropping; therefore, the Zoo should have warned invitees of the risks of straying from the "main" trail; (2) the Zoo should have adequately marked the main trail or constructed an appropriate barrier to restrict visitors to the main trail; (3) the Zoo should have enforced its chaperon policy.

> *Thus where there is negligence which causes injuries to a child, the law of this state affords a remedy.*

*Tincani*, at 857 (quoting *Ochampaugh*, at 527).

The Court of Appeals' reliance on the *Ochampaugh* language is not dispositive. First, the quoted language was not the basis for the court's decision. In *Ochampaugh*, the plaintiff brought a wrongful death action against Seattle for the death of his two sons, ages 6 and 8, who drowned in a pond located on city property. The main issue before us in *Ochampaugh* was whether the pond owned by the City of Seattle constituted an "attractive nuisance". We affirmed the trial court's summary judgment in favor of Seattle, holding a body of water having natural characteristics and no hidden dangers not ordinarily found in such bodies of water is not an attractive nuisance. *Ochampaugh*, at 520-22.

Second, the *Ochampaugh* language quoted above was the court's response to the appellants' proposal the court repudiate the notion children can be trespassers and impose upon the landowner a duty of exercising reasonable care toward children, whose presence the landowner knows of or can reasonably anticipate. *Ochampaugh*, at 526. The court responded it had already done so with respect to *artificial conditions* upon the land by adopting the doctrine of attractive nuisance. With respect to *activities* carried on by the possessor of land, the court stated a possessor has a duty of reasonable care not to injure a very young child of whose presence the possessor is aware, regardless of the child's status, and even though no attractive nuisance is involved. *Ochampaugh*, at 527 (citing *Sherman v. Seattle*, 57 Wn.2d 233, 356 P.2d 316 (1960) (3-year-old child severely injured by a lift apparatus located on the defendant's property); *Helland v. Arland*, 14 Wn.2d 32, 126 P.2d 594 (1942) (5-year-old child killed when a milk truck ran over her)).

The facts of this case do not require application of a duty of reasonable care based on either the "tender years" doctrine or the doctrine of attractive nuisance. Since Tincani was almost 15 when he was injured, he had long outgrown the "tender years". *See McDermott v. Kaczmarek*, 2 Wn. App.

643, 654-55, 469 P.2d 191 (1970) (a 7-year-old beyond tender years); *Ochampaugh*, at 526 (children ages 6 and 8 beyond tender years). Moreover, the cliff on which Tincani was injured was not an "active instrumentality" in the sense it was physically operated by the Zoo, nor was it an artificial condition upon the land.

### The Zoo's Duty To Warn

■ Having rejected the basis for the Court of Appeals' holding, we next decide whether the jury's special verdict is sustainable. For a general verdict,

> [t]he determinative issue is whether there was evidence or reasonable inferences arising therefrom to sustain a verdict in plaintiff's favor. The evidence must be considered in a light most favorable to plaintiff. *Shelby v. Keck*, 85 Wn.2d 911, 913, 541 P.2d 365 (1975).

*Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 261, 840 P.2d 860 (1992). Our review of a special verdict differs slightly from that of a general verdict. *See* CR 49(a) (Special Verdict).[3] If the jury's answers to the special interrogatories (the questions which constitute the special verdict) conflict, the court attempts to harmonize the answers. However, if the court cannot reconcile the answers, "[n]either a trial court nor an appellate court may substitute its judgment for that which is within the province of the jury. . . .. [T]he only proper recourse is to remand the cause for a new trial." (Citations omitted.) *Blue Chelan, Inc. v. Department of Labor & Indus.*, 101 Wn.2d 512, 515, 681 P.2d 233 (1984).

The jury gave the following answers on the special verdict form:

> **QUESTION NO. 1:** What was the status of plaintiff Richard Tincani at the time he was climbing on the rock from which he fell at Walk In the Wild Zoo? (Check only *one* of the answers)

| Answer: | Yes | No |
|---|---|---|
| (a) Trespasser | | |
| (b) Licensee | X | |
| (c) Business Invitee | | |

---

[3]Because no single interrogatory in this case resembles a general verdict, we do not apply CR 49(b).

QUESTION NO. 2: Were any of the following negligent? Answer "yes" or "no" after the name of the defendant and the name of each entity not a party to this action.

| Answer: | Yes | No |
|---|---|---|
| Defendant: Walk In the Wild Zoo | X | |
| Entity: Moses Lake School District | X | |

If you answer Question No. 2 "no" as to defendant Zoo, sign and return this verdict. If you answer Question No. 2 "yes" as to the defendant Zoo, then answer Question No. 3.

QUESTION NO. 3: Was such negligence a proximate cause of injury to the plaintiff? Answer "yes" or "no" after the name of the defendant and each entity, if any, found negligent by you in Question No. 2.

| Answer: | Yes | No |
|---|---|---|
| Defendant: Walk In the Wild Zoo | X | |
| Entity: Moses Lake School District | X | |

QUESTION NO. 5: Was the plaintiff, Richard Tincani, negligent or did he assume the risk of injury?

Answer (yes) or (no)

Answer: yes

. . . .

QUESTION NO. 8: Assume that 100 percent represents the total combined fault which proximately caused the plaintiff, Richard Tincani's injury. What percentage of this 100% is attributable to the plaintiff, Richard Tincani's, negligence and/or assumption of risk and what percentage of this 100% is attributable to the defendant and entity whose negligence was found by you in Question No. 3 to have been the proximate cause of the injury to the plaintiff, Richard Tincani? (Your total must equal 100%).

| Answer | Percentage |
|---|---|
| To Plaintiff: Richard Tincani | 65% |
| To Defendant: Walk In The Wild Zoo | 25% |
| To Entity: Moses Lake School District | 10% |

Clerk's Papers (CP), at 266-68.

The parties argue over the proper interpretation of these five answers. The Zoo claims it owed Tincani, a licensee, no duty to protect him from a natural condition with open and apparent dangers. According to the Zoo, once the jury ruled Tincani was a licensee, the jury, as a matter of law, had to

answer "no" to question 2. Absent the existence of a duty to Tincani, the Zoo could not be negligent.

In response, Tincani argues the jury could reasonably find the Zoo negligent for violations of duties owed to him *as a business invitee*. The special interrogatory does not indicate whether the Zoo breached a duty owed to Tincani while he was an invitee or licensee. Because the trial court properly instructed the jury on proximate causation, Tincani claims the jury could reasonably conclude violations of the Zoo's duties to Tincani as invitee were the proximate cause of his injuries.

The parties' arguments raise two questions: Could the jury reasonably find the Zoo at fault for violating duties to Tincani (1) as a licensee, or (2) as an invitee?

We conclude we cannot harmonize the jury's determination that Tincani was a licensee when he fell with its finding that the Zoo was negligent. Neither is sufficient to uphold the verdict. Therefore, we find an irreconcilable conflict among the jury's answers which only a new trial can resolve.

### Duty To Warn Licensees of Natural Conditions

The jury found Tincani was a licensee at the time of his injury. The Restatement (Second) of Torts § 330 (1965) defines a licensee as "a person who is privileged to enter or remain on land only by virtue of the possessor's consent." *Younce v. Ferguson*, 106 Wn.2d 658, 667, 724 P.2d 991 (1986). In *Memel v. Reimer*, 85 Wn.2d 685, 538 P.2d 517 (1975), we adopted the Restatement (Second) of Torts § 342 (1965) to define a landowner's responsibility to licensees for dangerous conditions on the land. That section provides:

A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,

(a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and

(b) he [or she] fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and

(c) the licensees do not know or have reason to know of the condition and the risk involved.

Restatement (Second) of Torts § 342 (1965), *quoted in Memel*, 85 Wn.2d at 689; *Younce v. Ferguson*, 106 Wn.2d at 667-68.

The duties in Restatement (Second) of Torts § 342 turn on the respective knowledge of landowner and licensee. First, the landowner must know, or have reason to know, about a hidden danger created by a natural condition. In *Memel*, we described the extent of the duty arising from this knowledge.

> We are not requiring that the occupier either prepare a safe place, or that he [or she] affirmatively seek out and discover hidden dangers. What we do impose is a duty to exercise reasonable care where there is a known dangerous condition on the property and the occupier can reasonably anticipate that [the] licensee will not discover or realize the risks. Under these circumstances, the landowner can fulfill his [or her] duty by either making the condition safe or by warning [the] licensee of the condition and its inherent risks.

*Memel*, 85 Wn.2d at 689.

Second, the licensee must not know, or have reason to know, about the dangers presented by a natural condition. A licensee's full understanding that a natural condition is dangerous ends any liability of the landowner for the condition.

> [E]ven though a dangerous condition is concealed and not obvious, and the possessor has given the licensee no warning, if the licensee is in fact fully aware of the condition and the risk, there is no liability to him [or her].

Restatement (Second) of Torts § 342 cmt. 1. The jury was properly instructed regarding the Zoo's duties to Tincani as a licensee. No exception was made to the instruction.

Citing *Swanson v. McKain*, 59 Wn. App. 303, 796 P.2d 1291 (1990), *review denied*, 116 Wn.2d 1007 (1991), the Zoo argues it did not owe Tincani, a licensee, any duty to warn or protect him from risks associated with the obvious, *natural condition* of the cliff. Swanson was injured after diving into shallow water off Camano Island in Puget Sound. Swanson sued the McKains, the owners of the home where he was staying, alleging they breached a duty to warn him of the dangers and characteristics of the tidal waters into which he dove. The Court of Appeals affirmed the trial court's dismissal of Swanson's lawsuit on summary judg-

ment, concluding as a matter of law that Swanson was a licensee and, as such, was owed no duty to warn of natural conditions. *Swanson*, at 309, 311. Relying on our decision in *Ochampaugh v. Seattle*, 91 Wn.2d 514, 588 P.2d 1351 (1979) the court held "natural conditions constitute 'obvious and apparent' dangers as a matter of law, precluding liability on the part of a possessor toward a licensee." *Swanson*, at 314.

The rule for "natural conditions", established in *Ochampaugh* and developed in *Swanson*, merely restates the duties created under § 342 of the Restatement. It is not a separate defense to liability. *See* Restatement (Second) of Torts § 342 cmt. e (immaterial that a dangerous condition is natural rather than artificial). The open and apparent dangers from a natural condition put a licensee on notice: proceed at your own risk. A reasonable landowner may presume licensees will discover the risk and, conversely, the licensee knows or has reason to know of the dangerous natural condition, extinguishing any duty to warn on the part of the landowner.

We agree with the *Swanson* court that a landowner has no duty to warn *licensees* about open and apparent dangers from a natural condition. As discussed below, a separate set of duties governs a landowner's duties to protect invitees from such dangers. However, we disagree with *Swanson* that natural conditions constitute open and apparent dangers as a matter of law. *See Swanson*, 59 Wn. App. at 314. The phrase "open and apparent" assumes knowledge on the part of the licensee. Whether a natural hazard is open and apparent depends on whether the licensee knew, or had reason to know, the full extent of the risk posed by the condition. That is a question of fact.[4]

Turning to the issues in this case, could the jury reasonably find the Zoo at fault for violating its duties to Tincani as a licensee? The trial court gave instruction 20, proposed by the Zoo, on the duty of care for dangerous natural conditions:

---

[4]Our ruling on this point does not preclude trial courts from weeding out meritless claims prior to trial. A trial court may still enter summary judgment against a licensee if a *genuine* issue of material fact does not exist over a licensee's awareness of an obvious danger, or over a landowner's lack of knowledge of a hidden risk.

> The duty of care which an owner or occupier of premises owes to a business invitee, licensee or trespasser does not require the owner or occupier to warn of, prevent access to or make safe a natural condition, the danger of which is open and apparent to everyone.

CP, at 259. If the jury found the Zoo at fault based on duties to licensees, the jury either had to disregard this instruction or conclude the danger from the cliff was not open and apparent. Instruction 20 states the law correctly for licensees and trespassers. It would be reversible error for the jury to disregard it. *Nichols v. Lackie*, 58 Wn. App. 904, 907, 795 P.2d 722 (1990) (where verdict indicates a jury disregarded the court's instructions, a new trial is proper), *review denied*, 116 Wn.2d 1024 (1991). We presume the jury followed lawful instructions. *Hizey v. Carpenter*, 119 Wn.2d 251, 270, 830 P.2d 646 (1992) (we presume jury followed the court's instructions); *Bordynoski v. Bergner*, 97 Wn.2d 335, 342, 644 P.2d 1173 (1982) (same).

Next, the jury reasonably could not, and did not, conclude Tincani failed to understand the risk of harm from the cliff. First, uncontradicted testimony from the sole eyewitness to the accident established Tincani knew or had reason to know the cliff was dangerous. Jorge Rodriquez, Tincani's companion at the Zoo, watched from a neighboring hill as Tincani tried to descend the rock face. On cross examination, Rodriquez conceded Tincani climbed partway down the cliff, *climbed back to the top*, and then made another attempt down.

Q: Now when you first saw Rick on top of the cliff, he tried to climb partway down that cliff; correct?

A: Yes, that's correct.

Q: And then he got stumped because he could go no further?

A: Uh, I don't know about going no further, but as I remember, you know, from, you know, things that — when he climbed back up, you know, you know, I thought, you know, he couldn't go any further down that trail.

Q: He was trying to climb down and you figure he could go no further so he went back to the top?

A: Yes

Q: And when he was back up on top of the cliff, you told him to go back, didn't you?

A: Yes, I did.

Q: And what did you mean by "go back"?

A: Well, I assumed he had gotten up there by a trail, so I told him to go back on the trail, backtrack on the trail and come back from the trail he came on.

Q: Go back the way you got up there, in other words?

A: Yes.

Verbatim Report of Proceedings (VRP), at 540-41. Tincani disregarded the advice of his friend, tried for a second time to descend the cliff, and fell.

Given this and the evidence presented at trial, the jury could not reasonably conclude the Zoo breached its duties to Tincani as a licensee. Tincani presented evidence from a private investigator and an expert in ergonomics to establish the deceptiveness of the approach to the rock outcropping. Both testified they could not gauge the dangerousness of the dropoff merely by looking down from the top, but neither attempted to climb partway down the rock face. See VRP, at 109-10 (testimony of David Williams); VRP, at 509 (testimony of Paul Champney).

Had Tincani fallen over the edge at the top or stumbled immediately, the jury could have relied on Plaintiff's evidence. However, Tincani climbed partway down the outcropping, stopped, and then climbed back up. The only reasonable inference from this testimony was Tincani could not find an easy way down. Even if he had not appreciated the risk of falling while at the top of the outcropping, Tincani knew the cliff was dangerous when he climbed partway down. Thus, Plaintiff's evidence could not establish a reasonable inference Tincani was unaware of the risk.

Second, by answering on question 5 that Tincani was negligent or assumed the risk, the jury had to have concluded Tincani knew "of the specific risk associated with climbing down the cliff" and "understood the nature of this risk". CP, at 61.[5] The jury reached the only reasonable con-

---

[5]In both the jury instructions and special verdict form, the parties and the trial court treated comparative negligence and assumption of the risk as equal reductions in damages. This is correct for cases involving implied unreasonable and implied reasonable assumption of risk — the doctrine of contributory fault subsumesboth. *Scott v. Pacific W. Mt. Resort*, 119 Wn.2d 484, 503, 834 P.2d 6

clusion available: Tincani knew or had reason to know climbing down the cliff was dangerous.

We find no grounds to uphold the jury's finding of fault based on a breach of duties to Tincani as licensee. The trial court upheld the jury's verdict, finding in part

> the jury did take into consideration Instruction Number 20 and applied it to the, or used it in conjunction with the other instructions that had been given, including 13 [duties to invitees] and 14 [straying from area of invitation] and concluded at that point in time there was still some obligation on the part of the defendant to the plaintiff. Now, whether it was because they felt that the danger was not that apparent, or exactly what the reasoning was, I do not know.

VRP, at 850. We find no evidence in the record Tincani did not know or have reason to know the rock outcropping was dangerous. Under § 342 of the Restatement (Second) of Torts, Tincani's knowledge of the risk bars any liability on the Zoo's part.

### Duty To Warn Invitees

Plaintiff contends the jury found the Zoo at fault based on violations of duties to Tincani as a invitee. A landowner must follow a separate set of duties for invitees. Under Restatement (Second) of Torts § 343 (1965),

> [a] possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, [the possessor]
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

In contrast to what a licensee may expect, an invitee "is . . . entitled to expect that the possessor will exercise reasonable care to make the land safe for his [or her] entry". Restate-

---

(1992) (doctrine of unreasonable assumption of the risk has been subsumed in comparative negligence law). However, for cases involving express and implied primary assumption of the risk, these doctrines negate a landowner's duty and bar completely any recovery. *Scott*, 119 Wn.2d at 498.

ment (Second) of Torts § 343 cmt. b. Reasonable care requires the landowner to inspect for dangerous conditions, "followed by such repair, safeguards, or warning as may be reasonably necessary for [the invitee's] protection under the circumstances." Restatement (Second) of Torts § 343 cmt. b. The trial court correctly instructed the jury on these duties.

The trial court did not instruct the jury correctly, however, on the Zoo's duty regarding known or obvious dangers. Under Restatement (Second) of Torts § 343A,

> (1) A possessor of land is not liable to . . . invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

We conclude, as did the Court of Appeals, that this section of the Restatement is the appropriate standard for duties to invitees for known or obvious dangers. *See, e.g., Ford v. Red Lion Inns*, 67 Wn. App. 766, 840 P.2d 198 (1992), *review denied*, 120 Wn.2d 1029 (1993); *Jarr v. Seeco Constr. Co.*, 35 Wn. App. 324, 666 P.2d 392 (1983); *Swanson v. McKain*, 59 Wn. App. 303, 796 P.2d 1291 (1990), *review denied*, 116 Wn.2d 1007 (1991).

The trial court's instruction 20 erroneously stated a landowner *never* has a duty to warn an invitee about open and apparent dangers from a natural condition.

In limited circumstances, Restatement (Second) of Torts § 343A creates a duty to protect invitees even from known or obvious dangers. This occurs when a possessor "should anticipate the harm despite such knowledge or obviousness". Restatement (Second) of Torts § 343A(1).

> [R]eason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be *distracted*, so that he [or she] will not discover what is obvious, or *will forget* what he [or she] has discovered, or fail to protect . . . against it. Such reason may also arise where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable [person] in [that] position the *advantages* of doing so would *outweigh the apparent risk*.

(Italics ours.) Restatement (Second) of Torts § 343A cmt. f (1965). Distraction, forgetfulness, or foreseeable, reasonable advantages from encountering the danger are factors which trigger the landowner's responsibility to warn of, or make safe, a known or obvious danger.[6]

Regardless of the error in instruction 20, the jury could not, as a matter of law, base its verdict on Tincani's earlier status of invitee. Plaintiff's argument rests on a misconception: a breach of duties to Tincani as an invitee remains an actionable claim even though Tincani suffered injuries while a licensee.[7] That is incorrect. The negligent failure to prevent an invitee from straying into prohibited areas *extends the area of invitation*; it does not, as Plaintiff's argument presumes, create a separate claim for negligence. *Egede-Nissen v. Crystal Mt., Inc.*, 93 Wn.2d 127, 133, 606 P.2d 1214 (1980) (jury could not base negligence verdict on landowner's failure to make reasonable effort to mark area of invitation).

If the Zoo were negligent in creating boundaries, the area of invitation would have extended to all places a zoo patron reasonably believed were held open to him or her. Once the patron strayed beyond that extended area, though, the patron would become a licensee with a corresponding change in the Zoo's duties. *Egede-Nissen*, 93 Wn.2d at 132-33.

Because the jury found Tincani strayed from the area of invitation and was a licensee when he fell, Plaintiff's argument is insufficient to uphold the jury's finding of fault. Duties to invitees exist only when an individual is on the physical plot of land within the area of invitation. "[T]he visitor has the status of an invitee only while he [or she] is on the part of the land to which his [or her] invitation

---

[6]The Restatement (Second) of Torts § 343A cmt. f (1965) offered these three circumstances as examples and we repeat them as such. They describe some of the instances in which a landowner has a duty to warn of known or obvious dangers.

[7]We distinguish this case from one where an individual suffers an injury as an invitee, strays beyond the area of invitation, and suffers a subsequent injury as a licensee. Under those circumstances, the individual has two separate claims for negligence.

extends". Restatement (Second) of Torts § 332 cmt. l. Tincani suffered injury as a licensee, outside the area of invitation, and therefore he may not recover for prior claims as an invitee.

Given the complexity of this area of the law, the instructions and the special verdict form may have confused the jury. The trial court did not instruct the jury on the negation of duties caused by a change in status. If the jury did in fact premise its finding of fault on a breach of duties to invitees, this result would contradict the jury's finding that Tincani was a licensee, requiring a new trial. Furthermore, the court's instructions on negligence (instruction 9) and proximate cause (instruction 8) may have led the jury to believe it could find the Zoo negligent under a general duty of ordinary care. Question 2 on the special verdict form asks only whether the Zoo was negligent, not whether it was negligent given its specific duties based on Tincani's status.

If the jury had received proper instructions, could it reasonably conclude on this record that the Zoo violated duties to Tincani as an invitee? We believe it could. First, sufficient evidence exists to find the Zoo negligently marked the main trail, extending the area of invitation to include the cliff. Second, the jury could reasonably conclude the Zoo should have anticipated harm from the cliff despite its obvious dangers. Given the droves of young visitors to the Zoo, combined with an invitation to "walk in the wild", sufficient evidence exists to determine the Zoo should have foreseen harm as dictated in Restatement (Second) of Torts § 343A.

We express no opinion on the merits of these claims. We review them only to determine whether a new trial would result in a meaningful verdict or would be a useless exercise. We conclude a new trial is appropriate on these issues.

### Judgment Notwithstanding the Verdict

Although the jury's conclusion Tincani was a licensee bars his recovery, a judgment for the Zoo notwithstanding the verdict is not appropriate here. The jury's answers to the special interrogatories reflect an irreconcilable conflict. On

the one hand, the jury's conclusion Tincani was a licensee when he fell implies the Zoo had no duty to warn him about the dangers posed by the cliff. On the other hand, the jury's conclusion the Zoo was negligent and at fault implies the Zoo did have such a duty to protect Tincani and failed to do so. Under Restatement (Second) of Torts § 343A, the Zoo has such a duty if it should have anticipated harm to invitees despite their knowledge of the cliff's dangers.

We cannot determine whether the jury's answer of licensee was correct and the finding of fault was in error, or the converse — the answer of licensee was mistaken and the finding of fault was correct. The jury's answers therefore conflict irreconcilably. The complexity of premises liability law raises the question whether the standard of care should continue to turn upon the common law distinctions between invitee, licensee, and trespasser, or whether such distinctions should be replaced by a negligence standard of reasonable care. *See Ochampaugh v. Seattle*, 91 Wn.2d 514, 530-31, 588 P.2d 1351 (1979) (Dolliver, J., dissenting) (advocating abandoning the common law classifications in favor of a duty of reasonable care under all circumstances). That larger question is not now before us.

In this case, precedent demands we apply the common law classifications as a means of determining duty. *See Younce v. Ferguson*, 106 Wn.2d 658, 662-66, 724 P.2d 991 (1986). In so doing, we conclude the Court of Appeals' holding impermissibly broadens premises liability law in Washington by extending a duty of reasonable care to children, regardless of their age or status on the premises. We therefore reverse the Court of Appeals insofar as it holds a possessor of land owes children a duty of reasonable care regardless of age or status.

## II

### Assumption of the Risk

The Court of Appeals held Tincani's assumption of the risk was not a complete bar to his recovery against the Zoo. *Tincani v. Inland Empire Zoological Soc'y*, 66 Wn. App. 852,

860, 837 P.2d 640 (1992). The Zoo disagrees and argues Tincani is completely barred from recovery because his conduct amounted to *implied primary* assumption of the risk. We agree with the Court of Appeals that Tincani's assumption of the risk did not bar recovery against the Zoo.

The assumption of risk doctrine is divided into four classifications: (1) express, (2) implied primary, (3) implied reasonable, and (4) implied unreasonable. *Scott v. Pacific W. Mt. Resort*, 119 Wn.2d 484, 496, 834 P.2d 6 (1992) (citing *Shorter v. Drury*, 103 Wn.2d 645, 655, 695 P.2d 116, *cert. denied*, 474 U.S. 827 (1985)). The Zoo contends Tincani's conduct constituted *implied primary* assumption of the risk. "Implied *primary* assumption of the risk means the plaintiff assumes the dangers that are *inherent in* and *necessary to* the particular sport or activity." *Scott*, at 500-01. Assumption of the risk in this form is really a principle of no duty, or no negligence, and so denies the existence of the underlying action. *Prosser & Keeton on Torts*, at 497. Therefore, implied primary assumption of the risk remains a complete bar to recovery. *Scott*, at 495.

We hold as a matter of law that this is a case of implied unreasonable assumption of risk and, thus, subject to the rules of contributory fault. The Zoo objected to the trial court's instruction 22 on the basis that while it provided the appropriate elements of primary implied assumption of the risk, it framed its use as a contributory fault reduction and not as a complete bar. In response, the trial court ruled this was a case of implied reasonable assumption of risk as defined in *Kirk v. WSU*, 109 Wn.2d 448, 746 P.2d 285 (1987). Reading directly from *Kirk*, the trial court concluded, "[w]e favor the reasoning of Professor Schwartz allowing implied reasonable assumption of risk to be given to the jury as a factor for consideration." VRP, at 810; *see Kirk*, at 458. The court instructed the jury accordingly.[8]

---

[8]As a minor matter, under the categories described in *Kirk v. WSU*, 109 Wn.2d 448, 746 P.2d 285 (1987) Tincani assumed an unreasonable risk when he attempted to climb down the cliff.

   *Implied unreasonable* assumption of risk . . . focuses not so much upon the duty and negligence of the defendant as upon the further issue of the objec-

We find the trial court appropriately rejected the Zoo's argument. An implied primary assumption of the risk arises where a plaintiff "has impliedly consented (often in advance of any negligence by defendant) to relieve defendant of a duty to plaintiff regarding specific *known* and appreciated risks." *Scott*, at 497 (citing *Kirk*, at 453); Restatement (Second) of Torts § 496C(1) (1965). A classic example of implied primary assumption of risk occurs in sports-related cases. "One who participates in sports 'assumes the risks' which are *inherent in the sport.*" *Scott*, at 498.

In *Scott*, a 12-year-old boy sustained head injuries while skiing at a commercial ski resort. In that case we reversed a summary judgment in favor of defendants and remanded the cause of action. *Scott*, at 503-04. We concluded while the boy assumed the risks inherent in the sport (implied primary assumption of risk), he did not assume the alleged negligence of the operator. However, we noted he may have been contributorily negligent (unreasonably assumed some risk). *Scott*, at 503. To the extent a plaintiff is injured as a result of a risk inherent in and necessary to a sport or other activity, the defendant owes no duty; and there is, therefore, no negligence. *Scott*, at 498. The Zoo argues Tincani completely assumed the risk of harm because the "risk of falling is inherent in and necessary to the activity of climbing down the face of a cliff." Supp. Br. of Pet'r, at 14. We disagree.

Tincani did not enter the Zoo to engage in the activity or sport of "rock climbing". Tincani visited the Zoo as part of a school field trip. Entrance and exploration of the Zoo was encouraged. The activity in which the students engaged was intended to be a "walk in the wild". The risk of serious injury while visiting a zoo should not be a risk inherent in and

---

tive unreasonableness of the plaintiff's conduct in assuming the risk. This form of assumption of risk is widely recognized as a form of contributory negligence. We have earlier concluded implied unreasonable assumption of risk is subsumed under contributory negligence and should be treated equivalently.

*Kirk*, at 454. Because contributory fault subsumes both implied reasonable and implied unreasonable assumption of the risk, there is no meaningful difference between them.

necessary to such an activity. In *Scott*, we concluded while the plaintiff assumed the risks inherent in the sport of skiing, he did not assume the risks created by the defendant's failure to provide reasonably safe facilities. *Scott*, at 502-03. Similarly, Tincani did not assume the risks created by the Zoo's failure to provide reasonably safe facilities. To the extent the Zoo encouraged visitors, especially children, to explore the grounds without adequate warnings, physical restrictions, or supervision, the jury could have concluded the Zoo increased the foreseeable risk that patrons would exceed the area of invitation, thereby exposing themselves to dangerous conditions. The jury's conclusion Tincani "assumed the risk or was negligent" acts as a damage-reducing factor; it does not obviate the Zoo's duty to Tincani while he was on its premises.

Applying the analysis in *Scott*, we conclude Tincani did not, in a primary sense, "assume the risk" and, thus, did not relieve the Zoo of those duties it owed to him. *See Scott*, at 499. The jury's verdict indicates it concluded Tincani voluntarily chose to encounter a risk *created* by the Zoo's negligence. *See Scott*, at 497. This type of assumption of risk is called "unreasonable assumption of the risk". *Scott*, at 499. Unreasonable assumption of the risk retains no independent significance from contributory negligence after Washington's adoption of comparative negligence. *Scott*, at 497. As we concluded in *Scott*, such assumption of the risk does *not bar all recovery* because the jury may apportion the percentage of fault attributable to each responsible party. *Scott*, at 499. We therefore concur with the Court of Appeals that Tincani's assumption of the risk did not bar recovery.

## Conclusion

We remand this case to the trial court for a new trial. As set forth in *Blue Chelan, Inc. v. Department of Labor & Indus.*, 101 Wn.2d 512, 681 P.2d 233 (1984), we have attempted to harmonize the jury's special verdict but find an irreconcilable conflict in the jury's answers. A new trial is therefore in order. We also concur with the ruling of the trial

court, affirmed by the Court of Appeals, that Tincani's actions did not constitute implied primary assumption of the risk.·

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, JOHNSON, and MADSEN, JJ., concur.